**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **THOMAS GRAHAM CATHEY AND RONALD "RONNIE" CATHEY,** | § § § | |
| **Plaintiffs,** | § § | |
| **v.** | § § | |
| **ASSUREDPARTNERS OF TEXAS, LLC,** | § § | **CIV. ACT. NO. 3:23-CV-02831-S** |
| **Defendant.** | § § | |

| | | |
|---|---|---|
| **ASSUREDPARTNERS OF TEXAS, LLC,** | § | |
| **Counterclaimant,** | § § | |
| **v.** | § § | |
| **THOMAS GRAHAM CATHEY,** | § § | |
| **Counterclaim-Defendant.** | § § § | |

## ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM

Defendant/Counterclaimant AssuredPartners of Texas, LLC ("AssuredPartners"), for its Answer, Affirmative Defenses, and Counterclaim, hereby alleges as follows.

### ANSWER TO COMPLAINT

#### DISCOVERY CONTROL PLAN

1.      Pursuant to Rule 190.3 of the Texas Rules of Civil Procedure, the Catheys intend to conduct discovery in this case under Level 2.

**ANSWER:    This paragraph consists of legal contentions to which no response is required.**

## SUMMARY OF CLAIMS

2.       The Catheys have not, and have no intent to, violate their restrictive covenants with AssuredPartners.  Instead, after making AssuredPartners a lot of money, for myriad reasons the Catheys explained in detail to AssuredPartners, the Catheys left their lucrative positions to pursue non-insurance-brokerage opportunities.  The Catheys have been transparent and forthright with their dealings with AssuredPartners throughout.  But the Catheys' good faith was recently repaid with a spurious and incendiary cease-and-desist letter from AssuredPartners that leaves the Catheys with no choice but to seek relief from this Court.

**ANSWER:  AssuredPartners denies the allegations in this paragraph.**

## PARTIES

3.       Graham is an individual resident of Dallas County, Texas.

**ANSWER:  AssuredPartners is without sufficient information to admit or deny the allegations in this paragraph, and therefore denies them.**

4.       Ronnie is an individual resident of Dallas County, Texas.

**ANSWER:  AssuredPartners is without sufficient information to admit or deny the allegations in this paragraph, and therefore denies them.**

5.       AssuredPartners of Texas, LLC, is a Texas limited liability company who may be served through its registered agent, CT Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201-3136.

**ANSWER:   AssuredPartners   denies   the   allegations   in   this   paragraph. AssuredPartners' principal place of business is in Florida, and its sole member is a Delaware corporation with its principal place of business in Florida.**

## VENUE AND JURISDICTION

6.     Venue is proper in Dallas County pursuant to Texas Civil Practice and Remedies Code § 15.002 because Dallas County is the county in which all or a substantial part of the events or omissions giving rise to the claim occurred.   The relevant employment contracts were negotiated, executed, and performed in Dallas County, Texas.

**ANSWER:   This paragraph consists of legal contentions to which no response is required.  To the extent a response is required, AssuredPartners denies that venue is proper in Dallas County, Texas.**

7.     This Court has subject matter jurisdiction because the amount in controversy is within the jurisdictional limits of the Court.   This Court has personal jurisdiction because AssuredPartners was organized under the laws of, and does business in, Texas.  AssuredPartners' specific contacts with Texas gave rise to the claims asserted herein.

**ANSWER:   This paragraph consists of legal contentions to which no response is required.  To the extent a response is required, AssuredPartners denies the allegations in this paragraph.**

## FACTS COMMON TO ALL COUNTS

**A.     The Catheys work hard for AssuredPartners and grow the business significantly.**

8.     AssuredPartners is part of a business that buys and aggregates smaller insurance brokerages in what is commonly referred to as a "roll-up."

**ANSWER:  AssuredPartners denies the allegations in this paragraph, as stated.**

9.     AssuredPartners hired Ronnie and Graham to grow their business.  Attached hereto as **Exhibits 1 and 2** are the employment agreements between AssuredPartners and the Catheys

(collectively the "Employment Contracts"). The Employment Contracts provide for non-solicit and non-interference provisions (the "Covenants").

**ANSWER: AssuredPartners admits that it hired the Catheys to grow and manage business for AssuredPartners. AssuredPartners admits that the Catheys entered into the Employment Contracts, the contents of which speak for themselves. AssuredPartners further admits that the Employment Contracts contain certain restrictive covenants relating to non-solicitation and non-interference obligations, but deny that these obligations represent the full scope of restrictive covenant obligations owed by the Catheys to AssuredPartners. AssuredPartners denies any remaining allegations in this paragraph.**

10.    During their entire employment with AssuredPartners, the Catheys were integral in more than doubling the top-line revenue in Dallas. During their employment, the Catheys' [sic] maintained and grew a very loyal following of clients for AssuredPartners.

**ANSWER: AssuredPartners denies the allegations in this paragraph, as stated.**

**B.    The Catheys resign their positions and AssuredPartners threatens them with legal action.**

11.    In the last two weeks, the Catheys resigned their employment with AssuredPartners, as is their right.

**ANSWER: AssuredPartners admits the allegations in this paragraph.**

12.    Graham intends to get out of insurance brokerage and instead provide outsourced risk management services for clients. Ronnie, who is 79 years old, does not yet know what he wants to do, if anything.

**ANSWER: AssuredPartners is without sufficient information to admit or deny the allegations in this paragraph, and therefore denies them.**

4

13.    On December 12, 2023, the Catheys received a cease-and-desist letter from counsel for AssuredPartners.  Below is AssuredPartners' allegations and the Catheys response:

| AssuredPartners' Allegation | The Catheys' Response |
|---|---|
| "[O]n good authority [] you have been disparaging the company to Restricted Clients." | Neither Graham nor Ronnie have disparaged AssuredPartners. |
| "AssuredPartners has learned of your potential plan to move into a 'consulting' role to serve as a managing general agent or managing general underwriter in the wholesale insurance space." | Neither Graham nor Ronnie have any intent to serve as a managing general agent or managing general underwriter in the wholesale insurance space. |
| "AssuredPartners has learned that you recently filed to reinstate the entity 'Cathey Insurance Services, LLC' with the Texas Office of the Secretary of State." | On May 12, 2023, the certificate of formation for Cathey Insurance Services, LLC ("CIS") was involuntarily forfeited pursuant to the notice attached hereto as **Exhibit 3**.  Under Texas law, after a tax forfeiture, officers and directors are *personally* liable for company debts incurred after the forfeiture.  TEX. TAX CODE §171.255.  Reinstating the charter was simply a risk-mitigation step, not some indication that the Catheys intend to use CIS for any ongoing business operations. |
| The Catheys have misused Confidential Information (as defined in their Employment Contracts) | The Catheys do not have, and have not forwarded, copied, transferred, or otherwise disclosed Confidential Information. |

**ANSWER: AssuredPartners admits it sent the Catheys correspondence on December 12, 2023, which speaks for itself.  AssuredPartners denies the Catheys' characterization of their December 12 letters, and specifically denies the Catheys' factual allegations and responses related thereto.**

## CAUSES OF ACTION AND THEORIES OF LIABILITY

14.    Each cause of action and theory of recovery below incorporates all of the allegations outlined above as if fully set forth herein.

**ANSWER:    AssuredPartners incorporates its answers to the preceding paragraphs as though restated in full herein.**

5

15.    All conditions precedent have been performed or have occurred.  The Catheys exercise their right to plead in the alternative.

**ANSWER:   This paragraph consists of legal contentions to which no response is required.  To the extent a response is required, AssuredPartners denies the allegations in this paragraph.**

16.    Pursuant to Texas Civil Practice and Remedies Chapter 37, the Catheys request the Court declare the rights, status, and other legal relations between them and AssuredPartners.

**ANSWER:  This paragraph consists of legal contentions to which no response is required.  To the extent a response is required, AssuredPartners denies that the Catheys are entitled to any of the relief requested in this paragraph.**

17.    The Catheys are persons interested under contracts – the Employment Contracts.

**ANSWER:  AssuredPartners admits the allegations in this paragraph.**

18.    The Catheys request the Court determine questions or construction and validity of the Employment Contracts.

**ANSWER:  This paragraph consists of legal contentions to which no response is required.  To the extent a response is required, AssuredPartners denies that the Catheys are entitled to any of the relief requested in this paragraph.**

19.    Pursuant to Texas Civil Practice and Remedies Chapter 37, the Catheys request declaratory relief, including but not limited to that:

a.    They have not violated the Covenants;

b.    What they intend to do for a living, if anything, does not violate the Covenants;

c.    They have not disparaged AssuredPartners; and

d.      They do not have and have not misused Confidential Information.

**ANSWER:  This paragraph consists of legal contentions to which no response is required.  To the extent a response is required, AssuredPartners denies that the Catheys are entitled to any of the relief requested in this paragraph.**

20.      Pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code and the Employment Contracts as prevailing parties, the Catheys request an award of their costs and reasonable and necessary attorneys' fees against AssuredPartners.

**ANSWER:  This paragraph consists of legal contentions to which no response is required.  To the extent a response is required, AssuredPartners denies that the Catheys are entitled to any of the relief requested in this paragraph.**

21.      The Catheys respectfully pray that AssuredPartners be cited to appear and answer herein, and that upon final hearing, the Catheys recover the following relief;

a.      Monetary relief over $250,000 or less and non-monetary relief;

b.      Declaratory relief;

c.      Pre-judgment and post-judgment interest;

d.      Judgment for reasonable attorneys' fees, expenses, and court costs from AssruedPartners; and

e.      Such other relief to which the Catheys are entitled.

**ANSWER:  This paragraph consists of legal contentions to which no response is required.  To the extent a response is required, AssuredPartners denies that the Catheys are entitled to any of the relief requested in this paragraph.**

WHEREFORE, AssuredPartners respectfully prays the Court enter judgment in its favor and against the Catheys, that the Catheys take nothing by way of their Complaint, and for all other relief the Court deems appropriate.

## AFFIRMATIVE DEFENSES

Without assuming any burden that would otherwise rest with the Catheys, AssuredPartners hereby asserts the following affirmative defenses:

1.     The Catheys' Petition fails, in whole or in part, to state a claim upon which relief may be granted.

2.     The Catheys' Petition fails to present a justiciable controversy between the parties.

AssuredPartners reserves the right to identify and assert additional affirmative defenses as they arise in the course of further investigation and discovery.

## COUNTERCLAIM FOR INJUNCTIVE RELIEF,
## DECLARATORY JUDGMENT, AND DAMAGES

AssuredPartners of Texas, LLC, ("AssuredPartners") for its Counterclaim for Injunctive Relief, Declaratory Judgment, and Damages against Thomas Graham Cathey ("Graham"), hereby alleges as follows.

### NATURE OF THE CASE AND INTRODUCTION

1.    This lawsuit stems from Graham's attempts to sidestep his non-competition, non-solicitation, and non-interference obligations to AssuredPartners, which AssuredPartners paid him millions of dollars to abide by.

2.    In 2019, Graham and his father, Ronald "Ronnie" Cathey ("Ronnie") (together with Graham, the "Catheys"), sold an insurance agency they owned—Cathey Insurance Services ("CIS")—to AssuredPartners for approximately $15 million ("the Transaction"). In exchange for this substantial payment, AssuredPartners purchased CIS's assets, clients, goodwill, and trade name from the Catheys via an Asset Purchase Agreement (the "APA").

3.    In conjunction with executing the APA, the Catheys each entered into Employment Agreements to remain employed with CIS following the Transaction, with ongoing responsibility for marketing AssuredPartners' products and services and servicing its clients.

4.    Both the APA and the Employment Agreements impose reasonable restrictive covenants on the Catheys, including restrictions on competition in the highly-competitive insurance industry and prohibitions on soliciting or interfering with AssuredPartners' clients and employees. These material terms were (and remain) of critical importance to AssuredPartners in the Transaction, as they are necessary to preserve and protect AssuredPartners' purchase of CIS and to maintain the client relationships for the substantial book of business the Catheys sold to AssuredPartners for millions of dollars.

5.     Despite the unambiguous restrictions in the APA and Employment Agreements, the Catheys have violated a number of their covenants to AssuredPartners.

6.     Graham readily admits that he intends to provide "risk management services for clients" for a part of the commissions generally paid to brokers like AssuredPartners.  Despite calling his new role by a different name, the substance of the services provided to clients is almost identical—*i.e.*, Graham will be advising clients on what brokers to use, coverages to purchase, and carriers to place insurance with.  His new role merely acts as a straw man between the client and the broker.

7.     Meanwhile, Graham has intentionally damaged AssuredPartners' reputation with clients, thereby harming its business goodwill and undermining the relationships AssuredPartners paid millions of dollars to acquire.  It appears Graham intends to work with these very clients in his new "risk management services" business.

8.     On December 12, 2023, AssuredPartners sent the Catheys a pair of cease-and-desist letters, requesting certain assurances from them regarding their business activities and compliance with the APA and Employment Agreements.

9.     The very next day, on December 13, 2023, the Catheys filed an Original Petition in Dallas County state court, seeking a declaratory judgment regarding the Employment Agreements (the "DJ Complaint").  ***Notably, the Catheys' DJ Complaint misleads the Court by saying nothing about the Transaction or the existence of the APA.***  Instead, the Catheys only mention—and only ask the Court to interpret—their obligations under the Employment Agreements.  The Catheys' DJ Complaint ignores the heightened restrictive covenants imposed by the APA, which AssuredPartners paid millions of dollars for.

10.     The Catheys' DJ Complaint readily admits that Graham "intends to get out of insurance brokerage and instead provide outsourced risk management services for clients."

11.     The APA, however, ***expressly prohibits*** the Catheys from providing "services related to marketing, selling or servicing Insurance Products, including, without limitation, risk-management services, loss-control services and other risk-related services" for a period of 5 years following the Transaction (*i.e.*, through March 15, 2024).

12.     In other words, by his own judicial admission, Graham intends to violate the terms of the APA.  His plans to provide "risk management services" to Restricted Clients also violates both the APA and his Employment Agreement.

13.     AssuredPartners now brings this action for injunctive relief, a declaratory judgment declaring the rights and obligations of the parties, and damages stemming from Graham's breaches.

### PARTIES, JURISDICTION, AND VENUE

14.     AssuredPartners is a limited liability company.  Its sole member is AssuredPartners Capital, Inc., a Delaware corporation with its principal place of business in Florida.

15.     Graham Cathey is an individual believed to reside at 6630 Blue Valley Lane, Dallas, TX 75214.

16.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.  Graham resides in the State of Texas, while AssuredPartners' sole member is a resident of Delaware and Florida for jurisdictional purposes.  The amount in controversy is in excess of $75,000.

17.     Venue is proper in this Court because Graham resides within this district and a substantial part of the events or omissions giving rise to the claims occurred here.

11

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### *The Parties' Business and Transaction*

18.    The Catheys formerly owned and operated an insurance company, CIS, located in Dallas, TX.

19.    On or about March 15, 2019, AssuredPartners purchased the assets, clients, and goodwill of CIS pursuant to the APA.  A true and accurate copy of the APA (without accompanying schedules) is attached hereto as **Exhibit 1**.

20.    Under the APA, AssuredPartners paid approximately $15 million to the Catheys in exchange for, among other things, "all of the assets of [CIS] comprising or used in connection with the Business (except for the Excluded Assets, as defined herein)[.]"  Those assets included, but are not limited to: (1) client accounts and documentation; (2) intangible assets, including the "Cathey Insurance" name and its associated goodwill and intellectual property; (3) physical assets; and (4) CIS's rights and obligations under its contractual agreements.

21.    The purchase provisions of the APA provide that the Transaction included a purchase of the "Cathey" trade name and intellectual property:

> (h)    all Intellectual Property and goodwill and going concern rights associated with the Agency Operations, including all rights to Trade Names of each Seller and any derivatives thereof (whether as a trade name, corporate name or otherwise) in connection with the Agency Operations;

(APA at § 2.01(h))

22.    The APA expressly required the Catheys to discontinue any future use of the CIS trade name:

> **6.03**    *Change of Name*.  Within one hundred eighty (180) days after the Closing Date (or such later time as Buyer may agree to in writing), each Seller shall discontinue any business operations under, and any use of, such Seller's company and trade names as listed on Schedule 6.03 (or any similar names) (collectively, the "Trade Names").  Each Seller agrees that it shall not conduct any business after the Closing Date under its Trade Names (or any similar name), other than such business as is in furtherance of the terms and provisions of this Agreement and as is for the benefit of, or at the express request of, Buyer.  Each Seller shall, as soon as practicable after the Closing, file appropriate amendments to its organizational documents to change the name of each Seller to a name substantially dissimilar (i.e., that does not include the words "agency," "insurance" or any words utilized as of the Closing) to its name as of the Closing.

(APA at § 6.03)

23.    As a material term of the APA, the Catheys agreed to sign Employment Agreements that required them to become employed by AssuredPartners for a term of employment following the Transaction.  True and accurate copies of the Catheys' Employment Agreements are attached hereto as **Exhibits 2** and **3**.

### *The Catheys' Reasonable Restrictive Covenants*

24.    As a material term of the APA, and to protect AssuredPartners' substantial investment into CIS's assets and goodwill following the transaction, the Catheys agreed to certain restrictive covenants, including restrictions on: competition in the Dallas area and certain Texas counties; solicitation of, or interference with, certain AssuredPartners policyholders, clients, and employees; harming AssuredPartners' goodwill with those doing business with AssuredPartners (including clients); and unauthorized use or disclosure AssuredPartners' confidential information.

25.    The APA includes the following restrictive covenants on the Catheys:

**6.08**    Restrictive Covenants.

(a)    Each Seller Party hereby agrees that it will not, and will not permit any of its respective Affiliates to, except on behalf of Buyer or Buyer's Affiliates, during the period beginning on the Closing Date and ending on the date that is the five (5) year anniversary of the Closing Date (the "Restricted Period"), directly or indirectly, for any reason, for its own account, or on behalf of, or together with or through, any other Person, whether as principal, agent, shareholder, creditor, participant, partner, promoter, director, officer, manager, member, equity owner, employee, consultant, sales representative, insurance agent or broker or otherwise:

(i)    own, control, manage, or participate in the ownership, control or management of, or render services or advice to, or have a material financial interest in, or lend its name to, any business or Person (or any Affiliate of a Person that is) engaged in, or that is undertaking to become engaged in, in whole or in part the Business within the Restricted Area;

(ii)    solicit, divert, accept business from, or service, directly or indirectly, for such Seller Party's account or the account of any other Person (other than Buyer or Buyer's Affiliates), during the Restricted Period, any Restricted Client with respect to Insurance Products or Related Services;

(iii)    hire or participate in the hiring of or directly or indirectly solicit or participate in the solicitation of any current or former employees of Buyer or its Affiliates to work for any Seller Party, any competitor of Buyer or any other Third Party; or

(iv)    knowingly or intentionally damage or destroy the goodwill and esteem of Buyer or the Agency Operations with its insurance Carriers, Brokers, employees, Clients, potential Clients, and any others who may at any time have or have had business relations with Buyer or the Agency Operations.

(APA, <u>Ex. 1</u> at § 6.08)

26.    This 5-year "Restricted Period" is reasonable in light of the substantial money AssuredParters paid to the Catheys in the Transaction.

27.    The APA defines "Restricted Area" as Dallas, Tarrant, Denton, Collin, Hunt, Rockwall, Kaufman, and Ellis Counties in Texas.  (APA at § 1.61)

28.    "Restricted Client" is defined to mean "(a) any Client of the Agency Operations; (b) any Prospective Client within the twelve (12) months preceding the subject activity."  (APA, <u>Ex. 1</u> at § 1.62.)  Meanwhile, a "Client" is a "Person to which [CIS], [AssuredPartners], or any Affiliate of [CIS] or [AssuredPartners], as the case may be, provides Insurance Products and/or Related Services."  (APA, <u>Ex. 1</u> at § 1.10.)

29.    The APA defines "Business" as "soliciting, selling, servicing, renewing, replacing, providing, writing, placing, and/or marketing Insurance Products and Related Services."  (APA, <u>Ex. 1</u> at p. 1, "Recitals")

30.    The APA defines "Insurance Product" as:

**1.36**    "<u>Insurance Product</u>" means any one or more of the following products, whether provided to a business or an individual natural Person:

    (a)    property or casualty insurance, bonds or suretyship products; and

    (b)    individual or group life, health, disability, dental or long-term care insurance, including employer-sponsored programs with such products.

(APA, <u>Ex. 1</u> at § 1.36)

31.    The APA defines "Related Services" to expressly include "risk-management services" and "other risk-related services":

**1.60**     "Related Services" means any one or more of the following, whether provided for a fee, and whether provided by a Seller or a Third Party:

(a)     services related to marketing, selling or servicing Insurance Products, including, without limitation, risk-management services, loss-control services and other risk-related services;

(b)     services related to group Employee Benefit Plans, including, without limitation, employee enrollment, education and training services, administration and eligibility services and data management services;

(c)     services related to claims, including without limitation, claims management, monitoring, handling and processing, subrogation services, collateral analysis, claims reviews and claims advocacy;

(d)     captive-management services; and

(e)     third-party administration services.

(APA, Ex. 1 at § 1.60.)

32.     In other words, the APA *expressly prohibits* the Catheys from owning or operating a company that provides "risk-management services" or that in any way "market[s], sell[s] or servic[es] Insurance Products."  Furthermore, the Catheys are not allowed to solicit, divert, accept business from, or service any "Restricted Client" in order to provide any form of Insurance Products or Related Services (including "risk-management services").

33.     These restrictions are critical to preserving AssuredPartners' investment in the Transaction, and they are entirely reasonable in light of the consideration the Catheys received for agreeing to them.  While providing risk-management services, Graham would be in a position to profit from his placement of AssuredPartners clients with other brokers and carriers, much like he would profit if he were working with a broker directly.  What's more, the legitimate, protectable business interests at stake—the goodwill and client relationships AssuredPartners purchased in the Transaction—would be impacted just like if Graham worked at a brokerage and diverted clients. That is *exactly* why the APA extends to "Related Services," rather than simply applying to sales at a brokerage.  AssuredPartners paid handsomely for this common "sale of business" restriction.

34.    The APA provides that "in the event of a breach of threatened breach" of the restrictive covenants in Section 6.08, AssuredPartners will be entitled to obtain injunctive relief:

> (d)    The Parties recognize and agree that in the event of a breach or threatened breach by any Seller Party bound hereby of Section 6.08, money damages would not be an adequate remedy to Buyer for such breach and, even if money damages were adequate, it would be difficult to ascertain or measure with any degree of accuracy the damages sustained by Buyer from such breach or threatened breach. Accordingly, if there is or should be a breach or threatened breach by any Seller Party of the provisions of Section 6.08, Buyer shall be entitled to injunctive relief restraining such Seller Party from any such breach. Nothing in the preceding sentence shall limit or otherwise affect any remedies that Buyer or its Affiliates may otherwise have under applicable Law.

(APA, Ex. 1 at § 6.08(d))

35.    In addition to the restrictive covenants found in the APA itself, the APA also required—as a material term of the Transaction—that the Catheys sign and deliver their Employment Agreements to AssuredPartners as a condition of closing.  (APA, Ex. 1 at § 3.03(c))

36.    The Employment Agreements contain the following post-employment restrictive covenants against soliciting, selling to, servicing, or interfering with certain AssuredPartners "Restricted Clients" for a period of 2 years following the separation of employment, as well as restrictions on the solicitation and hiring of AssuredPartners' employees:

> 3.    **Non-Solicitation & Non-Interference**.
>
> (a)    During Employee's employment with the Company, Employee shall not induce or attempt to induce, or refer to a third party the purpose of such third party inducing or attempting to induce, any person or entity to purchase an Insurance Product (as defined below) from any entity other than a member of the Employer Group. Furthermore, during the twenty-four (24) month period immediately following the Separation Date (the "Restricted Period"), Employee shall not directly or indirectly through another person or entity (each, a "Restricted Activity"):
>
> (i)    offer, sell, solicit, quote, place, provide, renew, or service any insurance product or service to, for, or on behalf of, any Restricted Client;
>
> (ii)    take any action intended, or reasonably likely, to cause any Restricted Client, or any vendor, insurance carrier, wholesale broker, other client of the Employer Group, or any other third party that, in each case, Employee knows or has reason to know has a material business relationship with the Employer Group, to diminish its business with, or cease or refrain from doing business with, the Employer Group; or
>
> (iii)    solicit for employment, hire, engage to perform services, or induce to terminate employment with the Employer Group, any of the Employer Group's current employees, or solicit for employment, hire, or engage to perform services, any person that was employed by the Employer Group within the six (6) months prior to the cessation of such person's employment with the Company for any reason.

16

(Employment Agreements, Exs. 2/3 at § 3(a))

37.     The Employment Agreements also contain provisions requiring the Catheys to return all AssuredPartners "Confidential Information" at the conclusion of employment, and to not engage in the unauthorized use or disclose such information.  (Employment Agreements, Exs. 2/3 at § 2)

38.     Like the APA, the Employment Agreements expressly entitle AssuredPartners to obtain injunctive relief in the event of a breach or threatened breach:

4.     **Remedies.**  In the event of the breach or a threatened breach by Employee of any of the obligations of Sections 2 or 3, (the "Restrictive Covenants") the Company, in addition to other rights and remedies available to it, shall be entitled to injunctive relief and may apply to any court for specific performance, temporary, preliminary, and/or permanent injunctive relief, or other relief in order to enforce such obligations or prevent any breach of such obligations.  In addition, in the event of a breach by Employee of any of the Restrictive Covenants, the Restricted Period shall be tolled until such breach has been cured.  Employee further acknowledges and agrees that each member of the Employer Group is an intended third-party beneficiary of this Agreement.

(Employment Agreements, Exs. 2/3 at § 4)

39.     The Employment Agreements further provide that in the event of litigation to enforce them, the prevailing party shall be entitled to recover its reasonable attorneys' fees and costs:

18.     **Attorneys' Fees.**  If either the Company or Employee engages one or more attorneys to enforce any of the terms of this Agreement or otherwise protect it against any breach or threatened breach of this Agreement, whether or not a lawsuit or claim is actually filed, the non-prevailing party shall be responsible for and shall promptly pay all of the prevailing party's reasonable attorneys' fees, costs and expenses, and all other reasonable costs and expenses, in addition to any other legal or equitable relief to which the prevailing party may be entitled.

(Employment Agreements, Exs. 2/3 at § 18)

### *The Catheys' Recent Departure and Breaches*

40.     On October 26, 2023, the Catheys approached AssuredPartners with a proposal to "buy back" their book of business from AssuredPartners.  AssuredPartners declined the proposal.

41.    On December 4, 2024, Graham resigned from AssuredPartners.  Thereafter, Ronnie instructed that all of Graham's commissions be reassigned and paid to Ronnie.  Four days later, on December 8, 2024, Ronnie resigned.

42.    In recent weeks, AssuredPartners has learned that Graham has been disparaging AssuredPartners to customers and "priming" customers to switch brokerages.

43.    Within mere days of the Catheys' resignations, two AssuredPartners clients with prior relationships to the Catheys—client relationships which were part and parcel of the Transaction—notified AssuredPartners of their intention to switch insurance brokers.  Upon information and belief, Graham diverted these accounts to third-party brokers and intends to act as an "outsourced risk manager" for these "Restricted Clients."

44.    AssuredPartners has also learned (and Graham later admitted) that Graham intends to remain in the insurance brokerage industry as a consultant to provide outsourced risk-management services, in violation of Section 6.01(a)(i) of the APA.

45.    The provision of outsourced "risk management services" to "Restricted Clients" violates the plain language of the Employment Agreement, as well as the APA.

46.    AssuredPartners also learned that on November 28, 2023—while still employed by AssuredPartners, and without telling anyone at the company—Graham filed to reinstate the entity "Cathey Insurance Services, LLC" with the Texas Office of the Secretary of State.  Graham contends that he did so as a "risk-mitigation step" to avoid potential company debts (*see* DJ Complaint at ¶ 13), but it is unclear why he did so, and did so without telling anyone at AssuredPartners, given that AssuredPartners purchased CIS in 2019.

47.    In addition, on December 5, 2023—the day after his resignation—Graham formed a new entity, "Cathey Risk Consulting, LLC," with the Texas Office of the Secretary of State.

Given the term "risk consulting" in the title, it appears this is the company name Graham intends to use for his "outsourced risk management services" business, despite having sold the "Cathey insurance" trade name to AssuredPartners via the APA.

***The Cease & Desist Letters and DJ Complaint***

48.     On December 12, 2023, AssuredPartners sent the Catheys letters demanding they immediately cease-and-desist from further breaches of the APA and the Employment Agreements, comply with their contractual and legal obligations going forward, and preserve all relevant evidence for potential litigation.  True and accurate copies of these letters to Graham and Ronnie (without enclosures) are attached hereto as **Exhibits 4** and **5**, respectively (the "C&D Letters").

49.     AssuredPartners also requested the Catheys provide written assurances regarding their compliance with their contractual and legal obligations.  For example, as to Graham, AssuredPartners requested:

**Demand to Cease & Desist and for Assurances**

You must immediately cease and desist from any further breaches of the Agreement and comply with all terms of the APA and Employment Agreement.  To that end, AssuredPartners hereby demands that you provide the following reasonable assurances in writing no later than **close of business on Wednesday, December 13, 2023**:

(i)     You will immediately cease any further use of the "Cathey" trade name, including rescinding your pending filing with the Secretary of State;

(ii)    You will not directly or indirectly own, control, manage, or participate in the ownership, control, or management of, or render services or advice to, or have a material financial interest in, or lend your name to, any business engaged in the solicitation, sale, servicing, renewing, replacing, providing, writing, placing, and/or marketing any insurance products or related services, through March 15, 2024;

(iii)   You will not directly or indirectly offer, sell to, solicit, quote, place, provide, renew, or service any insurance product or service to, for, or on behalf of any "Restricted Client" through December 4, 2025;

(iv)    You do not possess or otherwise have access to any AssuredPartners "Confidential Information," as that term is defined in the Employment Agreement, or any other AssuredPartners property.  If you do have possession of such information or property, please notify me immediately to arrange for its return; and

(v)     You have not forwarded, copied, transferred, or otherwise disclosed any AssuredPartners "Confidential Information" to any other person, except as necessary in the course of your job duties for AssuredPartners.  If you have done so, please notify me immediately to rectify the situation.

(Ex. 4 at pp. 3-4.)

50.     On December 13, 2023 (*i.e.*, the very next day), rather than provide AssuredPartners with any assurances or other written response to the C&D Letters, the Catheys filed the DJ Complaint in Dallas County state court.

51.     Despite the C&D Letters' heavy emphasis on the Catheys' restrictive covenant obligations under the APA, ***the DJ Complaint does not include a single reference to the APA or even mention the Transaction***.  Instead, the DJ Complaint only asks the Court to interpret and declare the parties' rights and obligations under the Employment Agreements.  The DJ Complaint also does not challenge the enforceability of Graham's restrictive covenants in the Employment Agreements.

52.     Critically, the DJ Complaint readily admits that Graham intends to provide services in violation of the non-compete obligation found in Section 6.08(a)(i) of the APA: "Graham intends to get out of insurance brokerage and instead provide outsourced risk management services for clients."  (DJ Complaint at ¶ 12.)

53.     As AssuredPartners understands the phrase "outsourced risk management services for clients," it appears Graham's plan is to provide advice and counsel to clients on their insurance needs, much like a broker such as AssuredPartners would do.  In this capacity, Graham would be paid a fee (out of the broker's commission) for advising on what broker(s) to use, coverage(s) to seek, and carrier(s) to place coverage with.  In short, Graham plans to work in a very similar job with merely a different title; he stands to profit (and AssuredPartners will be harmed) just the same as if he went to work at another insurance brokerage.

54.     ***This kind of activity is expressly prohibited under the APA.***

55.     Graham's plan to provide "outsourced risk management services" to Restricted Clients would also violate the terms of both the APA and the Employment Agreement.

56.     Put simply, AssuredPartners paid Graham ***millions*** of dollars pursuant to the APA, which requires him to, among other things, not own or operate any business providing "risk-management services" or "other risk-related services" for five year, nor provide any such services to "Restricted Clients" for two years following the separation of his employment from AssuredPartners.  Despite these obligations, that is ***exactly*** what Graham intends to do, according to his own pleadings.

57.     AssuredPartners is therefore entitled to injunctive relief and damages stemming from Graham's breaches.

<u>**CAUSES OF ACTION**</u>

**Count I – Breach of Contract (APA)**

58.     AssuredPartners incorporates by reference the foregoing allegations as though fully restated herein.

59.     The APA between AssuredPartners and the Catheys is valid, enforceable, and supported by substantial consideration.

60.     As further detailed above, Graham has breached the APA by, among other things: (i) owning and operating a "risk-management services" company; (ii) attempting to divert, solicit, provide insurance services to, or otherwise interfere with AssuredPartners' relationship with its "Restricted Clients"; (iii) knowingly and intentionally damaging AssuredPartners' goodwill and relationships with its clients; and (iv) using the "Cathey" trade name to sell "Insurance Products and Related Services."

61.     These breaches relate to material terms of the APA.

62.     AssuredPartners did not commit any prior material breach of the APA, nor has it excused Graham's performance.

63.     As a direct and proximate result of Graham's breaches and threatened breaches, AssuredPartners has suffered and will continue to suffer irreparable harm.

64.     Per the terms of the APA, AssuredPartners is entitled to preliminary and permanent injunctive relief to prevent Graham's breaches and threatened breaches of the APA.

65.     AssuredPartners will suffer and is at risk of suffering irreparable harm if relief is denied, which outweighs any harm to Graham if he is made to comply with his contractual promises.

66.     The public interest will not be harmed if Graham is enjoined and required to abide by the terms of the APA.

67.     As a direct and proximate result of Graham's breaches and threatened breaches, AssuredPartners has sustained damages in excess of $75,000, in an amount to be proven at trial, including but not limited to costs and attorneys' fees incurred in enforcing and securing its rights under the Agreement, lost profits and other compensatory damages, the purchase price of the APA, and other damages available under the law.

### Count II – Breach of Contract (Employment Agreement)

68.     AssuredPartners incorporates by reference the foregoing allegations as though fully restated herein.

69.     The Employment Agreement between AssuredPartners and Graham is valid, enforceable, and supported by substantial consideration.

70.     As further detailed above, Graham has breached his Employment Agreement by, among other things attempting to divert, solicit, provide insurance services to, or otherwise interfere with AssuredPartners' relationships with, its "Restricted Clients."

22

71.     Graham's breaches relate to material terms of the Employment Agreement.

72.     AssuredPartners did not commit any prior material breach of the Employment Agreement, nor has it excused Graham's performance.

73.     As a direct and proximate result of Graham's breaches and threatened breaches, AssuredPartners has suffered and will continue to suffer irreparable harm.

74.     Per the terms of the Employment Agreement, AssuredPartners is entitled to preliminary and permanent injunctive relief to prevent Graham's breaches and threatened breaches of the Employment Agreement.

75.     AssuredPartners will suffer and is at risk of suffering irreparable harm if relief is denied, which outweighs any harm to Graham if he is made to comply with his contractual promises.

76.     The public interest will not be harmed if Graham is enjoined and required to abide by the terms of the Employment Agreement.

77.     As a direct and proximate result of Graham's breaches and threatened breaches, AssuredPartners has sustained damages in excess of $75,000, in an amount to be proven at trial, including but not limited to costs and attorneys' fees incurred in enforcing and securing its rights under the Agreement, lost profits and other compensatory damages, the purchase price of the APA, and other damages available under the law.

**Count III – Breach of the Duty of Loyalty**

78.     AssuredPartners incorporates by reference the foregoing allegations as though fully restated herein.

79.     As an employee of AssuredPartners, Graham owed AssuredPartners a duty of undivided loyalty and best efforts on behalf of his employer.

80.     Through the actions described herein, while Graham was employed by AssuredPartners, he intentional damaged AssuredPartners' relationships and goodwill with certain clients in order to subsequently divert that business away from AssuredPartners.

81.     These actions constitute a breach of the duty of loyalty.

82.     AssuredPartners has been harmed by Graham's breaches.

83.     As a direct and proximate result of Graham's breaches, AssuredPartners has sustained damages in excess of $75,000, in an amount to be proven at trial, including but not limited to lost profits, compensatory damages, and other damages available under the law.

84.     In fairness and equity, any profits or earnings by Graham during, or as a result of, his breaches should be disgorged.

### Count IV – Declaratory Judgment

85.     AssuredPartners incorporates by reference the foregoing allegations as though fully restated herein.

86.     28 U.S.C. § 2201 permits the Court to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

87.     AssuredPartners respectfully requests the Court declare the rights and obligations of the parties to this action under the APA and the Employment Agreements.

### PRAYER FOR RELIEF

WHEREFORE, Counterclaimant AssuredPartners respectfully requests the Court:

A.     Enter judgment in AssuredPartners' favor and against Graham Cathey on each cause of action set forth above;

B.     Enter temporary, preliminary, and permanent injunctive relief enjoining Graham from:

    (i)    Owning, controlling, managing, or participating in the ownership, control or management of, or rendering services or advice to, or having a material financial interest in, or lending his name to, any business engaged in, or that is undertaking to become engaged in, in whole or in part, the sale or marketing of insurance products, including any risk-management services, loss-control services, and other risk-related services, within the "Restricted Area" (as that term is defined in the Agreement), until March 15, 2024;

    (ii)    Knowingly or intentionally damaging or destroying the goodwill and esteem of AssuredPartners with its insurance carriers, brokers, employees, clients, potential clients, and others with a business relationship with AssuredPartners, until March 15, 2024;

    (iii)    Offering, selling, soliciting, quoting, placing, providing, renewing, or servicing any insurance product or service to, for, or on behalf of any "Restricted Client" (as that term is defined in the Agreement), until 2 years from Graham's separation of employment from AssuredPartners;

    (iv)    Taking any action intended, or reasonably likely, to cause any Restricted Client, or any vendor insurance carrier, wholesale broker, other client of AssuredPartners, or any other third party to diminish their business with, or cease or refrain doing business with, AssuredPartners, until 2 years from Graham's separation of employment from AssuredPartners;

    (v)    Soliciting for employment, hiring, engaging to perform services, or inducing to terminate employment with AssuredPartners, any of AssuredPartners' current employees, or soliciting for employment, hiring, or engaging to perform services, any person that was employed by AssuredPartners within the 6 months prior to the cessation of such person's employment with AssuredPartners for any reason, for a period of 2 years from Graham's separation of employment from AssuredPartners;

    (vi)    Unauthorized possession, use, or disclosure of AssuredPartners' "Confidential Information," as that term is defined in the Agreement; and

    (vii)    Other acts as may be warranted by the facts, the law, and/or the APA and Employment Agreements.

C.    Entry of an equitable extension of the terms of the restrictive covenants contained in the APA and Employment Agreement to ensure AssuredPartners is made whole and receives the benefit of its bargain under those agreements.

D.    Enter a declaratory judgment declaring the parties' rights and obligations under the APA and Employment Agreement, consistent with the terms and interpretations set forth herein.

E.     Award all available monetary damages, including but not limited to lost profits, compensatory damages, liquidated damages, monies paid pursuant to the APA, and other damages available under the law.

F.     Disgorge any benefits, profits, earnings, or other unjust enrichment improperly obtained by Graham.

G.     Award pre- and post-judgment interest.

H.     Award AssuredPartners its costs and attorneys' fees incurred.

I.     All other relief the Court deems appropriate.


Respectfully submitted,

*/s/ Andrew T. Turner*
Andrew T. Turner
Texas Bar No. 24008968
andrew.turner@ogletree.com

**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**
8117 Preston Road, Suite 500
Dallas, Texas 75225
(214) 987-3800 (phone)
(214) 987-3927 (fax)

**ATTORNEYS FOR DEFENDANT ASSUREDPARTNERS OF TEXAS, LLC**


<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that December 21, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, with a copy sent via U.S. First Class Mail upon all counsel of record.

*/s/ Andrew T. Turner*
Andrew T. Turner

26